## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **URSULA NEWELL-DAVIS and SIVAD HOME AND COMMUNITY SERVICES, LLC,** | **Civil Action No.:_____** |
|         **Plaintiffs,** | |
|     **v.** | |
| **COURTNEY N. PHILLIPS, in her official capacity as Secretary of the Louisiana Department of Health; RUTH JOHNSON, in her official capacity as Undersecretary of the Louisiana Department of Health; JULIE FOSTER HAGAN, in her official capacity as Assistant Secretary of the Louisiana Department of Health's Office for Citizens with Developmental Disabilities; CECILE CASTELLO, in her official capacity as Health Standards Section Director of the Louisiana Department of Health; and DASINY DAVIS, in her official capacity as Facility Need Review Program Manager of the Louisiana Department of Health,** | |
|         **Defendants.** | |

## INTRODUCTION

1.      Plaintiffs bring this civil rights lawsuit in pursuit of the constitutional right to earn a living providing much-needed care for children in Louisiana. Plaintiff Ursula Newell-Davis is a mother, experienced social worker, and entrepreneur. She founded Sivad Home and Community Services, LLC, to use her degree in social work and her passion for helping the community to provide safe and affordable respite care for special needs children and their families. But Ms. Newell-Davis has been unable to pursue her dream solely due to a state law that prioritizes

1

incumbent businesses' economic interests over Plaintiffs' constitutional rights and the health, safety, and welfare of Louisiana children.

2.     Plaintiffs wish to provide "respite" services, which is temporary relief for parents of special needs children or parents of children with mental health challenges. Under Louisiana law, respite providers must undergo "Facility Need Review" ("FNR") before they are eligible to apply for a license to operate. La. Admin. Code tit. 48, § 12523(A).

3.     To obtain FNR approval, Plaintiffs must convince the Louisiana Department of Health ("Department")[1] that there is a "need" for their services. *Id.* at § 12523(C). This determination has nothing to do with an applicant's qualifications or fitness to operate. An applicant may be the most capable, fit, and passionate woman for the job. Yet FNR permits the Department to reject an applicant solely because there are purportedly "enough" businesses already operating. This is simple, unconstitutional economic protectionism.

4.     The purpose and effect of FNR is to protect the financial interests of existing providers against competition from upstart entrepreneurs like Plaintiffs. Under the Due Process and Equal Protection provisions of the United States and Louisiana constitutions, the government may not pursue simple economic protectionism, and FNR bears no rational relationship to any other conceivable legitimate government interest. It does not lower costs, ensure adequate supply, or improve quality. Instead, it drives up costs, reduces supply, harms quality, and deprives those most vulnerable—special needs children—of choices when it comes to the care they need.

---

[1] Defendants, members of the Louisiana Department of Health who are responsible for administering and enforcing the FNR process, are sued individually in their official capacity pursuant to 42 U.S.C. § 1983 and the doctrine of *Ex parte Young*, 209 U.S. 123 (1908), but are referred to collectively as the "Department."

5.     Plaintiffs allege that Louisiana's FNR statute and implementing regulations, La. Stat. Ann. § 40:2116 and La. Admin. Code tit. 48, §§ 12503(C)(2), 12523 *et seq.*, violate the Due Process of Law, Equal Protection, and Privileges or Immunities Clauses of the Fourteenth Amendment to the U.S. Constitution and the Due Process and Equal Protection provisions of the La. Const. art. I, §§ 2–3. Plaintiffs are fit, willing, and able to provide respite care. The FNR requirement is the only obstacle keeping them from operating. Plaintiffs seek to vindicate their right to earn a living in the occupation of their choice and to compete as a respite provider free of arbitrary and discriminatory barriers.

6.     Plaintiffs request a declaratory judgment that the challenged laws are invalid, unenforceable, and void; a permanent injunction against further enforcement of the challenged laws; and costs and reasonable attorney's fees. Plaintiffs do not seek money damages against the Defendants.

## JURISDICTION AND VENUE

7.     Plaintiffs bring this civil-rights lawsuit pursuant to 42 U.S.C. § 1983, for the violations of rights secured by the Due Process of Law and Equal Protection Clauses of the Fourteenth Amendment to the U.S. Constitution. Plaintiff Ursula Newell-Davis alleges, pursuant to 42 U.S.C. § 1983, the deprivation of rights secured by the Privileges or Immunities Clause of the Fourteenth Amendment. Plaintiffs also allege, pursuant to 28 U.S.C. § 1367, the deprivation of rights guaranteed under the Due Process and Equal Protection provisions of the La. Const. art. 1, §§ 2–3.

8.     Jurisdiction over the claims for declaratory and injunctive relief is vested in this Court by 28 U.S.C. §§ 1331 (federal question jurisdiction), 1343 (civil rights jurisdiction), 1367 (supplemental jurisdiction), and 2201–2202 (the Declaratory Judgment Act).

9.     Venue is proper in this Court, pursuant to 28 U.S.C. § 1391(b), on the grounds that all or a substantial part of the acts giving rise to Plaintiffs' claims occurred in Orleans and Jefferson Parishes, which are located in the Eastern District of Louisiana (*see* 28 U.S.C. § 98(a)).

## PARTIES

### Plaintiffs

10.     Plaintiff Ursula Newell-Davis is a United States citizen and resident of Orleans Parish. Ms. Newell-Davis is the sole owner of Plaintiff Sivad Home and Community Services, LLC, which is a limited liability company registered in Louisiana.

11.     Plaintiff Sivad Home and Community Services, LLC ("Sivad"), is a business that would provide respite care for families with special needs children in New Orleans and the surrounding areas, if not for the challenged FNR law and regulations. Plaintiff Ms. Newell-Davis wishes to open and operate Sivad, but she cannot do so without risking fines and other penalties because she was denied FNR approval.

### Defendants

12.     Each Defendant is sued only in his or her official capacity.

13.     Defendant Courtney N. Phillips is the Secretary of the Louisiana Department of Health. Plaintiffs are informed and believe, and on that basis allege, that Ms. Phillips is ultimately responsible for enforcing the FNR requirement established by La. Stat. Ann. § 40:2116 and La. Admin. Code tit. 48, §§ 12503(C), 12523 *et seq.*, challenged herein.

14.     Defendant Ruth Johnson is the Undersecretary of the Louisiana Department of Health. Julie Foster Hagan is the Assistant Secretary of the Louisiana Department of Health's Office for Citizens with Developmental Disabilities. Cecile Castello is the Health Standards Section Director of the Louisiana Department of Health. Dasiny Davis is the Facility Need Review Program Manager of the Louisiana Department of Health. Defendants are empowered to grant or

deny applications under the FNR process, to adopt rules and procedures to implement the "need" requirement challenged by this lawsuit, to enforce those rules, and to enjoin, fine, or otherwise prohibit Plaintiffs and other similarly situated persons from providing respite care without FNR approval. La. Admin. Code tit. 48, §§ 12501 (defining "Department"); 12503(C).

## FACTUAL ALLEGATIONS

### I.    PLAINTIFFS WANT TO PROVIDE SAFE, AFFORDABLE, AND MUCH-NEEDED RESPITE CARE TO SPECIAL NEEDS CHILDREN AND THEIR FAMILIES

15.    Plaintiff Ursula Newell-Davis has dedicated the past two decades of her career to helping her community. She earned her bachelor's and master's degrees in social work from Southern University at New Orleans and since then has been employed in social work.

16.    As a hospice social worker, Ms. Newell-Davis provided end-of-life support to patients and their families for twelve years. After that, she worked for three years at a behavioral health center that provides outpatient mental health services. There, she managed the center's day-to-day operations, promoted the center's community engagement, and trained staff on Medicaid compliance.

17.    In 2018, Ms. Newell-Davis started a consulting business to aid mental health agencies, schools, churches, and others who work with special needs populations. She teaches mental health workers best practices when it comes to working with children with disabilities and she trains staff on how to properly document their mental health services to ensure they are in compliance with Medicaid laws and regulations.

18.    In her job as a social worker consultant in and around New Orleans, Ms. Newell-Davis often encounters children from poorer backgrounds and from homes where parents work

odd hours or nightshifts, which means that many of these children find themselves at home alone after school.

19.     Between the lack of supervision and their disabilities, some such children can have a hard time completing basic tasks. Ms. Newell-Davis has observed that these children may not practice personal hygiene, make themselves meals, or complete their homework. Sadly, as a result, they sometimes are bullied at school for their hygiene or for wearing dirty clothes.

20.     Ms. Newell-Davis has also observed that unsupervised children she encounters in her work can fall into the wrong crowd and turn to criminal activity. Her business could provide supervision, which would prevent these children from engaging in illegal behavior.

21.     Through her professional experience, and as a special needs parent herself, she knows that being a parent to a special needs child is demanding and can leave parents overwhelmed or in need of time to themselves. Yet not everyone has access to help from friends or family members or an available caregiver at affordable prices.

22.     Ms. Newell-Davis founded Sivad Home and Community Services, LLC, to offer respite services to families with special needs children. Her services would provide temporary relief to parents, family members, and other caregivers of children with disabilities or other challenges. Additionally, she would use her time with the children to teach them basic life skills to assist them in the development of a successful and independent life. But she was denied that opportunity by the FNR process, which she contends is unconstitutional.

## II.     THE CHALLENGED LAW AND ITS ENFORCEMENT

23.     Respite care is "an intermittent service designed to provide temporary relief to unpaid, informal caregivers of the elderly and/or persons with disabilities." La. Admin. Code tit. 48, § 5003. Before operating, a respite care provider must (1) obtain FNR approval, and (2) apply

for a license as a "Home and Community Based Services" provider.[2] La. Admin. Code tit. 48, §§ 12501, 12523(A).[3]

24.     Any person who operates as a respite care provider without a license is guilty of a misdemeanor and subject to a fine of between two hundred fifty dollars and one thousand dollars. La. Stat. Ann. § 40:2120.6(A). Each day in violation constitutes a separate offense. *Id.*

25.     To obtain FNR approval, a respite provider must first submit an application to the Department and pay a $200 nonrefundable application fee. La. Admin. Code tit. 48, § 12505(A).

26.     The Department reviews the application solely to determine if there is a "need" for an additional provider in the geographic location designated by the applicant. *Id.* at § 12523(C)(1). An applicant will be approved and can then apply for a license only if evidence "establishes the probability of serious, adverse consequences to recipients' ability to access health care if the provider is not allowed to be licensed." *Id.* at § 12523(C)(2). The burden is on the applicant to provide such evidence. *Id.* at § 12523(C)(4).

27.     In determining whether a new provider is "needed," the Department considers: (1) the number of other providers in the designated geographic location, and (2) any allegations

---

[2] Home and community-based providers include "those agencies, institutions, societies, corporations, facilities, person or persons, or any other group intending to provide or providing respite care services, personal care attendant (PCA) services, supervised independent living (SIL) services, monitored in-home caregiving (MIHC) services, or any combination of services thereof, including respite providers, SIL providers, MIHC providers, and PCA providers." La. Admin. Code tit. 48, § 12501.

[3] A home and community-based provider is only eligible to apply for a license to operate from the Department after it receives FNR approval. La. Admin. Code tit. 48, § 12523(A). If Plaintiffs were able to secure FNR approval, they would then apply for a license. Plaintiffs do not challenge the licensure requirements that are separate and apart from the FNR approval process or any other health or safety regulations that pertain to home and community-based providers. Plaintiffs only challenge the requirement that applicants undergo FNR review and establish "need." They challenge these requirements on the basis that they are not related to health, safety, or any other legitimate governmental interest.

regarding a lack of access to the proposed services. *Id.* at § 12523(C)(3). The FNR regulations and the Department's website provide no guidance about how to prove "need," how many other providers are deemed "enough," and how to prove that denial would result in adverse consequences. Applicants are left to guess how to convince the Department that their service is needed.

28.     Plaintiffs are informed and believe, and on that basis allege, that there are no formal criteria guiding the Department when it determines what constitutes an adequate number of providers in the area and no formal factors establishing whether rejecting an applicant will result in a lack of access to care.

29.     Plaintiffs are informed and believe, and on that basis allege, that the FNR process does not entail any type of economic analysis or objective standards. Instead, FNR is a subjective and arbitrary process that allows the Department to deny applications at its whim.

30.     If able to obtain FNR approval, the applicant must then apply for a license from the Department. *Id.* at § 12523(A). While the FNR process only pertains to whether a new business is "needed," the subsequent licensure requirement relates to health and safety. Plaintiffs do not challenge the license requirement, but only the validity of the preceding FNR process.

31.     Applicants who receive FNR approval are bound by the type of services and location specified in their application and must submit a new application for FNR approval if they choose to expand their territory or type of service. *Id.* at § 12523(D).

32.     If FNR approval is denied, applicants may appeal and pay a $500 fee or may request supplemental review and submit additional evidence showing a need for their services. *Id.* at §§ 12505(B)(4), 12541(B)(5).

33.     The number of applicants denied FNR approval from January 2019 to September 2020 demonstrates how this process shuts out new businesses and limits competition.

34.     Plaintiffs are informed and believe, and on that basis allege, that between January 2019 and September 2020, the Department decided at least one hundred nineteen HCBS applications for FNR approval. Of those one hundred nineteen applications, eighty-six were denied. Each and every denied applicant received an identical two-page form letter, telling them merely that their application was denied without any other explanation unique to their application.

35.     Twenty-one of those eighty-six denials were submitted for supplemental review. All but one were denied a second time.

36.     In sum, nearly seventy-five percent of the applications for FNR approval were denied. These applicants were denied not because of their fitness to operate, but solely because the Department decided there was no "need" for them. The result is the denial of economic opportunity to qualified, aspiring entrepreneurs and the reduction of Louisianans' access to care.

## III.     THE FACILITY NEED REVIEW REQUIREMENT PREVENTS PLAINTIFFS FROM PROVIDING SAFE AND AFFORDABLE RESPITE CARE TO SPECIAL NEEDS CHILDREN AND THEIR FAMILIES

37.     Louisiana's FNR requirement has stopped Ms. Newell-Davis from fulfilling her dream of starting a business that serves special needs children and their families.

38.     In 2019, Ms. Newell-Davis applied for FNR approval to provide respite and supervised independent living services in Region 1.[4] In her application, she included statistical data that showed an increase in crimes committed by juveniles and therefore a need for services aimed at supervising and caring for young people. She described speaking to the local District

---

[4] Region 1 includes Jefferson, Orleans, Plaquemines, and St. Bernard Parishes. La. Admin. Code tit. 48, § 12507(A).

Attorney, who expressed a "dire need" for more early intervention efforts for juveniles. She also cited studies showing that respite care can lead to better outcomes for both children and their family members and lower incidences of negative behavior in the community.

39.   She also described speaking with representatives from Magellan (the state's Coordinated System of Care for youth with mental health or substance use challenges), who encouraged her to apply.

40.   The Department denied Plaintiffs' FNR application in a two-page form letter on February 19, 2020.[5] The Department did not base its denial on any purported lack of Plaintiffs' qualifications. Rather, it rejected their application solely for failure to demonstrate there was a need for an additional respite care business in the proposed service area. *See* Exhibit A.

41.   The Department cited two factors that it considered in reaching its decision: 1) the number of other home and community-based businesses in the same geographic location serving the same population that Plaintiffs wished to serve; 2) lack of allegations involving lack of access to healthcare services.

42.   The Department provided no explanation specific to Plaintiffs' application. They received the same denial letter that every other rejected applicant was sent between January 2019 and September 2020.

## IV.   HISTORY OF LOUISIANA'S FACILITY NEED REVIEW REQUIREMENT

43.   Pursuant to La. Stat. Ann. § 40:2116, the Department established the FNR process in 1990. Initially, the FNR requirement only applied to medical providers who sought to build nursing facilities or add extra beds.

---

[5] Plaintiffs do not challenge the Department's denial of their FNR application. In this suit, they only seek prospective relief.

44.     Over the years, the Department has expanded the FNR requirement to apply to home and community-based providers, including respite providers in 2009.

45.     Although it uses a different name, Louisiana's FNR process operates almost identically to a Certificate of Need ("CON") law, which exists in other states in the context of expensive healthcare infrastructure and equipment. Like Louisiana's FNR process, CON laws require that a provider show that its service or equipment is "needed" in the area where it wishes to operate. To determine whether there is a need, officials look at how many existing businesses are in the proposed service area and whether a new provider will take business away from those existing providers. CON laws insulate existing providers from competition, which make them very popular among Certificate-holding entities who lobby to keep CON laws on the books.

46.     CON laws arose as a purported cost-saving measure in the 1960s. Insurers at the time (and later Medicare and Medicaid) reimbursed medical providers based on their costs, causing many to believe that providers had little reason to control excessive investment or spending.[6]

47.     Proponents of CON laws believed that providers were investing in expensive infrastructure even when that investment could not be supported by market demand. They further believed that to recoup their costs, providers were charging higher prices. Thus, beginning with New York in 1964, states began enacting CON laws to restrict investment in expensive facilities or equipment to when it was supposedly "needed."

48.     The American Hospital Association soon began lobbying for more states to follow suit, and in 1974 the federal government enacted a requirement that states create a CON program in order to receive federal dollars under the National Health Planning Resources Development Act.

---

[6] Maureen K. Olhausen, *Certificate of Need Laws: A Prescription for Higher Costs*, Antitrust, Vol. 30, No. 1 (Fall 2015).

49.     Since CON laws were first enacted, the original justifications for these laws have been undermined by changed circumstances or refuted by research. First, reimbursement has now shifted to a fee-for-service model, meaning that the incentive problems for over-spending no longer exist.

50.     Second, research has shown that CON laws create shortages, increase prices, and decrease quality.[7] In 2004, the Federal Trade Commission and Department of Justice issued a joint report in which they presented empirical studies that show CON programs: "retard the entry of firms that could provide higher quality services than incumbents," "increase health care costs, as supply is depressed below competitive levels," and "shield incumbents from the need to offer improved or innovative services."[8] Based on these studies, the federal government repealed its CON mandate in 1987.

51.     Third, CON laws have expanded in scope and now govern even relatively modest investments, like starting a respite service, where their original economic justifications do not support such regulation. Yet because these laws are favored by hospital associations and other powerful interests, CON laws and similar laws that restrict the entry of new businesses, like the FNR process here, have stayed on the books.

52.     Whatever the original justifications for CON laws and the FNR process, changed circumstances and new evidence have made it apparent that they fail to achieve any public benefit.

---

[7] Thomas Stratmann & Matthew C. Baker, *Barriers to Entry in the Healthcare Markets: Winners and Losers from Certificate-of-Need Laws*, Mercatus Center at George Mason University, 1, 4–7 (2017).
[8] A Report by the Federal Trade Commission and the Department of Justice, *Improving Health Care: A Dose of Competition* 1, 304–05 (2004), https://www.ftc.gov/sites/default/files/ documents/reports/improving-health-care-dose-competition-report-federal-trade-commission- and-department-justice/040723healthcarerpt.pdf.

They do not lower costs, improve quality, or increase access. They solely boost the economic fortune of some providers at the expense of others.

### V.   LOUISIANA'S FACILITY NEED REVIEW PROCESS HAS NO RATIONAL RELATIONSHIP TO ANY LEGITIMATE GOVERNMENT INTEREST

53.     Louisiana's FNR process is said to control costs, improve quality, and increase access to care by reducing the number of providers.

54.     However, basic economics demonstrates that artificially reducing supply results in exactly the opposite. By limiting providers from entering the market, the FNR requirement leads to a shortage of care and insulates existing providers from competition, which allows them to charge higher prices and deliver lower-quality services.

55.     The FNR process itself belies any argument that it helps to control costs or improve quality of or access to care. It allows the Department to deny applicants regardless of their qualifications or how much they would charge merely because, in its subjective estimation, there are enough providers, and the applicant failed to prove "serious adverse consequences" to access to care.

56.     Artificially limiting the number of providers, by definition, limits access to care.

57.     By reducing the number of respite care providers, the FNR requirement jeopardizes the health and safety of one of Louisiana's most vulnerable populations: special needs children.

58.     Plaintiffs receive calls on a weekly basis asking when they will begin to operate. In many cases, children are being left unsupervised at home at unprecedented rates due to the pandemic and schools being closed. As summer approaches, parents are particularly anxious to have extra support from respite providers as children are out of school and at home.

59.     As the pandemic has shown, whether respite care is "needed" is constantly changing and the Department's determinations of need are nothing more than an arbitrary guess based on current circumstances.

60.     The FNR process serves no positive end. It protects existing businesses from competition at the expense of the public. And any potential justification for the FNR process cannot be maintained in the context of respite care providers, which entail low start-up costs and support needy populations.

## VI.     PLAINTIFFS' INJURY

61.     Plaintiffs are unable to lawfully provide respite care as a home and community-based provider in Louisiana because they have not obtained FNR approval.

62.     Plaintiffs will be subject to serious penalties if they offer such respite care without submitting to the FNR process and obtaining a license.

63.     Plaintiffs are unwilling to incur fines or face other penalties in order to pursue their business of respite care.

64.     Plaintiffs are informed and believe, and on that basis allege, that the "need" requirement has the purpose and effect of preventing new providers from entering the market to protect existing providers from competition.

65.     The challenged laws deprive Plaintiffs of the liberty of pursuing their chosen trade without serving any legitimate governmental interest.

66.     The challenged laws treat Plaintiffs differently than others similarly situated without serving any legitimate governmental interest.

67.     Plaintiffs have concrete and specific plans to apply for a license to operate as a respite care provider at such time as the challenged laws are declared unconstitutional and enjoined

as applied to respite care providers. But for the FNR process, Plaintiffs would apply for a license to provide respite care in Louisiana.

68.     An actual and substantial controversy exists between Plaintiffs and Defendants as to their respective legal rights and duties. Plaintiffs contend that the challenged laws are unconstitutional. Defendants dispute that contention.

69.     A judgment declaring the challenged laws unconstitutional and enjoining Defendants from enforcing those laws will restore Plaintiffs' ability to earn a living free of unconstitutional restrictions.

## LEGAL CLAIMS

### COUNT I

### Due Process of Law
### (Fourteenth Amendment to the U.S. Constitution)

70.     Plaintiffs allege and incorporate by reference each and every allegation set forth in the preceding paragraphs of this Complaint.

71.     The Due Process of Law Clause of the Fourteenth Amendment to the U.S. Constitution protects the right to earn a living in a chosen profession free from unreasonable government interference. Under this provision, no person may be deprived of his or her right to earn a living unless the law is rationally related to a legitimate government interest.

72.     Plaintiffs may not engage in their chosen occupation unless they submit to the FNR process.

73.     Plaintiffs are fit, willing, and able to provide respite services, but are prohibited solely because of the FNR process.

74.     FNR does not bear a rational relationship to protecting the public health, safety, or welfare. It does not, for example, reduce costs, improve the quality of, or ensure access to respite care.

75.     By artificially limiting supply based on whether a new provider will compete with existing providers, the FNR process increases costs, lowers quality, and decreases access to care.

76.     Nor is the FNR process rationally related to any other legitimate governmental interest that the state purports to have.

77.     It is not rationally related to, for example, preventing "cream skimming," both because respite care is not a high-profit service and because Plaintiffs seek to serve underprivileged populations.

78.     It does not increase access to rural care; instead, it disincentivizes investments in rural communities. Moreover, it applies across the state, regardless of whether the applicant seeks to operate in a rural area.

79.     Instead, the FNR process serves only the illegitimate end of economic protectionism.

80.     Not only does the FNR process have illegitimate ends, it uses illegitimate means. Regardless of its ends, the FNR process uses the illegitimate means of economic protectionism to achieve its goals.

81.     By enforcing the arbitrary, irrational, and fundamentally unfair "need" requirement, Defendants, acting under the color of state law, are depriving Plaintiffs of their constitutional right to earn a living in their chosen profession without due process of law.

82.     Plaintiffs are suffering and will continue to suffer substantial irreparable harm unless the arbitrary, irrational, and fundamentally unfair procedures established by Louisiana's FNR process are declared unlawful and enjoined by this Court.

### COUNT II

**Equal Protection**
**(Fourteenth Amendment to the U.S. Constitution)**

83.     Plaintiffs allege and incorporate by reference each and every allegation set forth in the preceding paragraphs of this Complaint.

84.     The Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution does not allow the government to treat similarly situated persons differently unless the unequal treatment bears a rational relationship to a legitimate governmental interest.

85.     The FNR requirement draws an arbitrary and irrational distinction between respite care providers who may legally provide care and those who may not.

86.     Under FNR, whether a respite care business may legally provide care in Louisiana is not determined by whether the business offers safe or affordable services. It is determined by the arbitrary criteria of whether the business has satisfied FNR review.

87.     Plaintiffs are as qualified in all relevant respects to offer respite care as providers that possess FNR approval from the Department.

88.     Moreover, many groups are able to legally provide care that substitutes for respite services when they are unavailable, including family members, friends, neighbors, babysitters, and full-fledged care-giving businesses like care.com. In the absence of respite services, families will turn to these groups to provide care.

89.     Plaintiffs are equally if not more qualified in all relevant respects to offer and provide respite care as those who may legally provide these substitutes.

90.     The "need" requirement bears no rational relationship to protecting public health or safety.

91.     Instead, by artificially limiting supply based on whether a new provider will compete with existing respite providers, the FNR process increases costs, jeopardizes public health and safety, and decreases access to care.

92.     FNR serves only the illegitimate goal of protecting FNR-approved providers from competition. And regardless of its ends, the FNR process uses the illegitimate means of economic protectionism to achieve its goals.

93.     The effect of the FNR process is to arbitrarily deny Plaintiffs the ability to operate while allowing those similarly situated to do the same for the sole purpose of protecting the latter from competition. This economic protectionism has no connection to protecting public health or safety. Instead, it operates at the expense of public health or safety.

94.     By enforcing this requirement, Defendants, acting under color of law, are irrationally and arbitrarily discriminating against Plaintiffs in favor of existing respite care providers and denying Plaintiffs their right to equal protection of the laws.

95.     Plaintiffs are suffering and will continue to suffer substantial and ongoing harm unless the discrimination established by Louisiana's FNR process is declared unlawful and enjoined by this Court.

### COUNT III

### Privileges or Immunities
### (Fourteenth Amendment to the U.S. Constitution)

96.     Plaintiffs allege and incorporate by reference each and every allegation set forth in the preceding paragraphs of this Complaint.

97.     The Privileges or Immunities Clause of the Fourteenth Amendment protects the right to earn a living in a lawful occupation of one's choice.

98.     By imposing an arbitrary and discriminatory "need" requirement to operate as a respite care provider, Defendants, acting under color of state law, are arbitrarily and unreasonably interfering with Plaintiff Newell-Davis's constitutional right to earn a living in a lawful occupation in violation of the Privileges or Immunities Clause.

99.     Plaintiff is suffering and will continue to suffer substantial irreparable harm unless the arbitrary, irrational, and fundamentally unfair procedures established by Louisiana's FNR process are declared unlawful and enjoined by this Court.

### COUNT IV

### Due Process of Law
### (La. Const. art. I, § 2)

100.    Plaintiffs allege and incorporate by reference each and every allegation set forth in the preceding paragraphs of this Complaint.

101.    Under the Louisiana Constitution, the right to earn a living is considered "fundamental," and the government may not substantially interfere with that right.

102.    Plaintiffs may not engage in their chosen occupation unless they submit to the FNR process.

103.    Plaintiffs are fit, willing, and able to provide respite services, but are prohibited solely because of the FNR process.

104.    FNR does not bear any relationship to protecting the public health, safety, or welfare. It does not, for example, reduce costs, improve the quality of, or ensure access to respite care.

105.    By artificially limiting supply based on whether a new provider will compete with existing providers, the FNR process increases costs, lowers quality, and decreases access to care.

106.    Nor is the FNR process related to any other legitimate governmental interest that the state purports to have.

107.    It is not related to, for example, preventing "cream skimming," both because respite care is not a high-profit service and because Plaintiffs seek to serve underprivileged populations.

108.    It does not increase access to rural care; instead, it disincentivizes investments in rural communities. Moreover, it applies across the state, regardless of whether the applicant seeks to operate in a rural area.

109.    Instead, the FNR process serves only the illegitimate end of economic protectionism.

110.    Not only does the FNR process have illegitimate ends, it uses illegitimate means. Regardless of its ends, the FNR process uses the illegitimate means of economic protectionism to achieve its goals.

111.    By enforcing the arbitrary, irrational, and fundamentally unfair "need" requirement, Defendants, acting under the color of state law, are substantially interfering with Plaintiffs' constitutional right to earn a living in their chosen profession in violation of the Louisiana Constitution.

112.    Plaintiffs are suffering and will continue to suffer substantial irreparable harm unless the arbitrary, irrational, and fundamentally unfair procedures established by Louisiana's FNR process are declared unlawful and enjoined by this Court.

### COUNT V

### Equal Protection
### (La. Const. art. I, § 3)

113.    Plaintiffs allege and incorporate by reference each and every allegation set forth in the preceding paragraphs of this Complaint.

114.    Article I, Section 3, of the Louisiana Constitution guarantees the equal protection of the laws, meaning no law may favor one class of persons over another unless the law suitably furthers an appropriate state interest.

115.    The FNR requirement draws an arbitrary and irrational distinction between respite care providers who may legally provide care and those who may not.

116.    Under FNR, whether a respite care business may legally provide care in Louisiana is not determined by whether the business offers safe or affordable services. It is determined by the arbitrary criteria of whether the business has satisfied FNR review.

117.    Plaintiffs are as qualified in all relevant respects to offer respite care as providers that possess FNR approval from the Department.

118.    Moreover, many groups are able to legally provide care that substitutes for respite services when they are unavailable, including babysitters, neighbors, family members, friends, and full-fledged care-giving businesses like care.com. In the absence of respite services, families will turn to these groups to provide care.

119.    Plaintiffs are equally if not more qualified in all relevant respects to offer and provide respite care as those who may legally provide these substitutes.

120.    The "need" requirement does not suitably further any appropriate state interest.

121.    Instead, by artificially limiting supply based on whether a new provider will compete with existing respite providers, the FNR process increases costs, jeopardizes public health and safety, and decreases access to care.

122.    FNR serves only the illegitimate goal of protecting FNR-approved providers from competition. And regardless of its ends, the FNR process uses the illegitimate means of economic protectionism to achieve its goals.

123.    The effect of the FNR process is to arbitrarily deny Plaintiffs the ability to operate while allowing those similarly situated to do the same for the sole purpose of protecting the latter from competition. This economic protectionism has no connection to protecting public health or safety. Instead, it operates at the expense of public health or safety.

124.    By enforcing this requirement, Defendants, acting under color of law, are irrationally and arbitrarily discriminating against Plaintiffs in favor of existing respite care providers and violating Plaintiffs' right to equal protection of the laws.

125.    Plaintiffs are suffering and will continue to suffer substantial and ongoing harm unless the discrimination established by Louisiana's FNR process is declared unlawful and enjoined by this Court.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the following relief:

1.    An entry of judgment declaring that Louisiana's Facility Need Review process, established by La. Stat. Ann. § 40:2116 and La. Admin. Code tit. 48, §§ 12503(C)(2), 12523 *et seq.*, is unconstitutional, facially, and as applied to Plaintiffs, because it deprives Plaintiffs of liberty without due process of law in violation of the Due Process of Law Clause of the Fourteenth Amendment to the U.S. Constitution, and Art. I, § 2, of the Louisiana Constitution;

2.    An entry of judgment declaring that Louisiana's Facility Need Review process, established by La. Stat. Ann. § 40:2116 and La. Admin. Code tit. 48, §§ 12503(C)(2), 12523 *et seq.*, is unconstitutional, facially, and as applied to Plaintiffs, because it deprives Plaintiffs of equal

protection of the laws in violation of the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution, and Art. 1, § 3, of the Louisiana Constitution;

      3.      An entry of judgment declaring that Louisiana's FNR process, established by La. Stat. Ann. § 40:2116 and La. Admin. Code tit. 48, §§ 12503(C)(2), 12523 *et seq.*, is unconstitutional, facially, and as applied to Plaintiff Newell-Davis, because it abridges Plaintiff Newell-Davis's privileges or immunities of citizenship, in violation of the Privileges or Immunities Clause of the Fourteenth Amendment to the U.S. Constitution;

      4.      An entry of a permanent injunction against Defendants prohibiting the enforcement of these statutory provisions, as well as any and all implementing administrative rules and regulations, and the practices and policies by which Defendants enforce these provisions; and

      5.      An award of attorney fees, costs, and expenses in this action pursuant to 42 U.S.C. § 1988; and an award of further legal and equitable relief as this Court may deem just and proper.

      DATED: January 12, 2021.

                                       Respectfully submitted,

| | |
|---|---|
| ANASTASIA P. BODEN* | /s/ SARAH R. HARBISON |
| Cal. Bar No. 281911 | SARAH R. HARBISON |
| MOLLIE R. WILLIAMS* | La. Bar No. 31948 |
| Cal. Bar No. 322970 | PELICAN INSTITUTE FOR PUBLIC |
| PACIFIC LEGAL FOUNDATION | POLICY |
| 930 G Street | 400 Poydras Street, Suite 900 |
| Sacramento, CA, 95814 | New Orleans, LA 70130 |
| Tel: (916) 419-7111 | Tel: (504) 952-8016 |
| ABoden@pacificlegal.org | sarah@pelicaninstitute.org |
| MWilliams@pacificlegal.org | |

*pro hac vice pending*

*Attorneys for Plaintiffs*

**John Bel Edwards**
GOVERNOR



**Stephen R. Russo, JD**
INTERIM SECRETARY

# State of Louisiana

Louisiana Department of Health
Office of the Secretary

February 19, 2020

**CERTIFIED MAIL – RETURN RECEIPT REQUESTED**
**RECEIPT #: 7008 1830 0000 3783 8950**

Ursula Newell-Davis
Sivad Home and Community Services, LLC
792 Mercedes Place
Terrytown, LA 70056

RE:     Notice of Denial of Facility Need Review Approval
        Applicant: Sivad Home and Community Services, LLC
        Home and Community Based Services Provider / Facility Need Review Application
        Module (Check all that apply): ____ PCA  X Respite  X SIL _____ MIHC
        Region: 1
        HCBSP FNR Application #: **HCBS-2019-93**

Dear Agency Contact Name/Agency Name: Ursula Newell-Davis / Sivad Home and Community
Services, LLC

Pursuant to Louisiana Revised Statute 40:2116 and the Facility Need Review regulations codified
and published in Louisiana Administrative Code (LAC), Title 48, Part I, Chapter 125, the
Louisiana Department of Health ("Department") has received your application for facility need
review (FNR) approval to apply for licensure as a new home and community based services
provider (HCBSP) to provide (Respite and Supervised Independent Living Services) and has
reviewed your application to determine if there is a need for an additional HCBSP to provide
(Respite and Supervised Independent Living Services) in the geographic location for which your
application was submitted.

In accordance with the LAC 48:1, Chapter 125, §12523.C(2), the Department shall grant facility
need review approval only if the application, the data contained in the application, and other
evidence effectively establishes the probability of serious, adverse consequences to recipients'
ability to access health care, if the provider is not allowed to be licensed.

Your application failed to provide data and evidence to effectively establish the probability of
serious, adverse consequences to recipients' ability to access health care if you are not allowed to
apply for licensure as an HCBSP. Additionally, in reviewing your application, the department
considered:

   a.   the number of other HCBS providers in the same geographic location and region
        servicing the same population; and
   b.   whether there were allegations involving issues of access to health care and services.

---

Bienville Building • 628 N. Fourth St. • P.O. Box 629 • Baton Rouge, Louisiana 70821-0629
Phone: (225) 342-9500 • Fax: (225) 342-5568 • www.ldh.la.gov
*An Equal Opportunity Employer*



**EXHIBIT**

**A**

Sivad Home and Community Services, LLC
February 19, 2020
Page 2

Therefore, it is the Department's decision to **deny** your application for FNR approval to apply for licensure as an HCBSP.

Pursuant to LAC 48: I, Chapter 125, § 12505(B)(4), you may choose to file an administrative appeal of the Department's decision, or you may choose to request a supplemental review of additional documentation to be submitted by the applicant. If you choose to file an administrative appeal, you must file the appeal within 30 calendar days after receipt of this letter; the administrative appeal must be filed pursuant to LAC 48:1, Chapter 125, § 12541.

If you choose to request a supplemental review of additional documentation, you must submit the written request for supplemental review within 30 calendar days after receipt of the Department's notice of denial of facility need review **and** prior to filing an administrative appeal. After the Department receives and approves your request for a supplemental review, you must then submit the supplemental materials within 30 days. The request for a supplemental review of additional documentation must be mailed to the following:

LDH Health Standards Section
Attn: Facility Need Review Program
P.O. Box 3767
Baton Rouge, LA 70821-3767

Upon a failure to submit the supplemental materials in a timely manner or upon a denial of the supplemental application, the applicant may choose to file an administrative appeal of the Department's decision to deny facility need review approval. The request for an administrative appeal shall be submitted within 30 days of the date of receipt of notice of said failure or denial. Failure to file timely for an administrative appeal shall exhaust the applicant's remedies with the Department, and the decision to deny the FNR application is final.

To request an administrative appeal of the Department's decision to deny the FNR application, you must send your appeal request in writing to the Division of Administrative Law (DAL). A fee of $500 is required.

The administrative appeal request must be mailed to the following address:

Division of Administrative Law – HH Section
P.O. Box 4189
Baton Rouge, LA 70821-4189

To ensure proper processing, the $500.00 fee shall be made payable to **LDH Licensing Fee** and mailed along with a copy of the administrative appeal request to:

LDH Licensing Fee
P.O. Box 62949
New Orleans, LA 70162-2949

Please note that if you decide not to request a supplemental review of additional documentation, but decide to proceed directly to the administrative appeal, you must send your appeal request in writing to the Division of Administrative Law within 30 calendar days of receipt of this letter, and you must follow the procedures in LAC 48:I, Chapter 125, §12541.

Sivad Home and Community Services, LLC
February 19, 2020
Page 3


Failure to follow the above procedure to request an appeal may result in a delay of your hearing and may result in your hearing being denied.

You may direct inquiries regarding this correspondence to the LDH Health Standards Facility Need Review Program Manager, at (225) 342-0454.

Warmly,

Stephen R. Russo, JD
Interim Secretary

By:

Sherlyn Sullivan
Interim Assistant Secretary
Office of Aging and Adult Services

Julie Foster Hagan
Assistant Secretary
Office for Citizens with Developmental Disabilities


cc:  LDH – Health Standards Section
     LDH – OCDD, Paul Rhorer